Good morning, Your Honors, and may it please the Court, Joshua Hammack on behalf of Mr.  I figure we should begin with the two elephants in the courtroom today, Salazar and Solomon. The District Court dismissed Mr. Hughes's complaint with prejudice because it thought he could not satisfy the statutory definition of consumer. Salazar controls that question. Mr. Hughes is a consumer, and the District Court erred in holding otherwise. So only the NFL's alternative arguments for dismissal, which the District Court did not reach, remain. And the normal approach used in Salazar is to vacate and remand so the District Court can consider them in the first instance. Eleven days ago, this Court decided Solomon, and the legal landscape shifted beneath us. That case held personally identifiable information includes information an ordinary person would understand to link someone to his video-watching history, but not information a sophisticated technology company would understand to do so, seemingly even when the disclosures at issue were intended to go and knowingly went to the sophisticated technology company and not to an ordinary person. While that holding is relevant to Mr. Hughes's case, it does not affect the outcome of this appeal for a simple reason. It resolves an argument the NFL never made. Even after Solomon, this Court should vacate and remand. In fact, Solomon itself counsels in favor of that result. So are you saying that if they made the argument, are you conceding that your client can't state a plausible claim in the wake of the decision? No, Your Honor. I'm not conceding that. What I'm saying is they did not make that argument, so we had no opportunity to respond to that argument, including by adding additional allegations about what ordinary people would understand regarding the code. They didn't make that argument. We had no notice of it, so we had no opportunity to respond. We can make those allegations. We should be permitted to do so on remand. Can you give us a sense of what those allegations would be? Because I read Solomon to occupy a pretty wide field. Well, I don't think Solomon says no allegations could ever sufficiently plead that an ordinary person would understand the transmissions at issue. It just held that those allegations didn't. All right. So what allegations would you add that might make a difference? Sure. For example, we could add allegations that the ordinary person does not interact with and does not need to understand the underlying computer code that operates behind a website. The ordinary person experiences that website in plain text because he operates on a device like a computer or a phone that translates that underlying code into plain text automatically. Isn't that – I mean, that wasn't true in Solomon? It may have been true, but it wasn't pleaded. It wasn't alleged. And so the court confronted whether the – Those aren't really facts. I mean, that's really just a different argument, right? I don't know that – I don't think it is. I think that is a different allegation. I think Solomon confronted the case where the ordinary person was confronted directly with the computer code that underlies a website or that operates behind a website. And that just isn't how an ordinary person experiences a website, and we could include allegations about that point. Now, I do want to point out as well Solomon involved a particularly garbled string of computer code that had all sorts of numbers and characters and kind of seemingly random phrases interspersed with, for example, the video title so that an ordinary person may not have been able to decipher it. Compare all of that with what appears at JA191, the computer code operating behind the website in our case, and you get what much more closely approximates a plain English reading of the video title. There's no characters or numbers or anything else interspersed between the words. The only thing that exists is hyphens. So the ordinary person already would understand the video title, for example, in our case much more easily than in Solomon. We could also allege that 75% of Americans, American adults, already have Facebook accounts. They already have Facebook IDs themselves, and these ordinary Americans could navigate to Facebook, a website on which they already have accounts, access the help page, and learn all about Facebook IDs. Facebook tells users those IDs are strings of numbers connected to one individual's account, that anyone who has the ID can see that person's profile. This was true in Solomon also, wasn't it? That 75% of Americans have access to that information. These are not facts that are unique to this case. I don't think they're unique to this case, but that's an allegation that was not present in Solomon, that 75% of Americans already have Facebook accounts, already have access to Facebook's description of what user IDs do, already know that Facebook IDs link a human being to a profile. So your view is that the panel that decided Solomon didn't understand how Facebook works because there was less – these facts weren't pleaded? 75% of Americans have Facebook accounts, and that would have been dispositive? Had the Solomon panel known that? I don't know that that alone would have been dispositive, but I think all of these allegations together, for example – and by the way, I don't want to cut off my opportunity. I know we have a briefing coming up in a couple of weeks where we anticipate including what we would plead if permitted to amend on remand. But I think the point in Solomon is that – Facebook, the term – this is the great stuff you can do with these things – but 210 times in Solomon the word Facebook appears. Correct. Do you think really it was lost on them just how ubiquitous Facebook is? Not at all, Your Honor. But Solomon was confined by the allegations before it, and the allegations did not include what I just said. And I do want to go back to the point that what this court has described as the preferred procedure when, as here, quote, circumstances have changed between the ruling below and the decision on appeal, unquote. That's New England Merchants National Bank versus Iran Power Generation and Transmission Company, 646 F2D 779. Solomon itself supports the vacate and remand decision. It said over and over, at least three separate times, that the plaintiff had notice of these specific deficiencies and didn't amend in response. Salazar supports vacating and remanding. Again, the same PIEI issue that Solomon resolved was lurking in the shadows in Salazar as well, but no party raised it. And so the court took no position on it, vacated and remanded. Did your client sign the privacy agreement? Sign the – excuse me, the privacy agreement? Yeah. I think there is a factual dispute about whether he consented to any terms or conditions that allowed the disclosures at issue. We plainly allege over and over that we did not. Isn't it clear he's a subscriber? Is it clear that he's a subscriber?  Yes, it is very clear that he's a subscriber. Can we get judicial notice that once you can't become a subscriber unless you go to the bottom and click I accept? I think you could – I think it's fair to say that he consented to the terms and conditions associated with his subscribership, which do not include any terms or conditions relevant to the disclosures at issue here, namely disclosures of statutorily defined PIEI to third parties without express written consent. Is that clear in the record that they don't? I think it is very clear in the record. And, in fact, the NFL's argument in its appellate brief here points to the policies it says govern, and those policies are about collection, not disclosure. So it's a very different issue than what we've alleged here. And one other thing, you started with saying what a reasonable person would understand. That's where you began, right? Well, I think Solomon asks the court to determine what an ordinary person would understand, yes. And do you understand our circuit to be committed to that test? Well, I guess at the moment it's somewhat unclear. I don't think the mandate has run in Solomon, so it's possible, for example, that the parties there will file a petition for rehearing or rehearing en banc and that will change. Well, is that issue part of this appeal? I'm sorry, which issue? Is that issue part of this appeal? The PIEI issue? Whether the test is what a reasonable person would understand. It isn't part of this appeal because it was not raised in the Solomon-adjacent context that Solomon resolves. So, no, the Solomon issue is not resolved in this appeal, which is exactly why. Well, the statute talks about identifiable information, right? Correct. So don't we have to decide what that means? I don't think you do have to decide what that means in this context because Solomon tells you what it means in the context that arose there. And the only question really that appears on this record is the one the district court resolved, which is whether Mr. Hughes is a consumer under the statute. And that question is governed by Salazar. So both of our elephants are trumpeting for the same conclusion, vacate and remand. We ask you to do exactly that. Thank you. Good morning, Your Honors. Hillary Preston from Vincent and Elkins for the National Football League. There's a number of issues that just came up in my colleague's statements that I want to address, but I do think it makes sense to start with the scope of Solomon. First of all, the NFL did raise the precise issue that is part of the Solomon decision. We raised in pages 44 and 45 of our briefing the precise issue of an allegation that a user has disclosed or a user has allowed for the disclosure of this alleged Facebook ID. That's the precise allegation that was at issue in both Solomon and in our case. And we raised the issue that that disclosure alone was not enough to meet the ordinary person standard. There's no dispute about that. It's in our briefing. Was it your argument, and correct me if I'm misremembering, but was it your argument that the disclosure, because there was no allegation in the complaint, that the plaintiff had information on his own Facebook page, the numbers just didn't matter, because we didn't even know whether that would connect to his Facebook page and reveal personal information? Yes, I think, Your Honor, that's exactly correct. So our argument in the briefing is exactly the same as what Solomon's argument was, which was there's nothing in the complaint that allows an ordinary person to identify this information with an actual human being. Now, excuse me, what this court did in response to that argument, which is dispositive in this case, is say there's two parts to that. One, there's a difficult, well, first, we're going to adopt the ordinary person standard, right, which I heard some of the proposed amendments that were just discussed here, I believe, are an effort to say the ordinary person standard is incorrect, which this court, of course, is bound by Solomon. But there's two parts to this issue. One is, can an ordinary person understand the code that is alleged to be the disclosure at the heart of the case? And also, there's nothing else in the complaint that allows whatever that code is, even assuming an ordinary person could understand it, to connect it to an individual. So that second part is the same argument that we made in our briefing. And I want to just draw the court's attention to the similarities here because it's factually indistinguishable. The facts of Solomon and the facts of Mr. Hughes' complaint are completely aligned. In both cases, you have the alleged disclosure at issue, the complaint of disclosure is a list of computer code. The one that is at issue in this case is on, I believe my colleague said JA191, I believe it's actually the Joint Appendix 273, is it the second amended complaint? And that's paragraph 42. What we have there is a list that's identified specifically by the C user field and then a number of, a series of numbers, in our case, nine numbers. In Solomon, that's the exact same fact, C user field plus numbers. The court said there is no way, I want to get it right, not plausible that an ordinary person would see the C user and conclude that phrase was a person's FID or Facebook ID. That decision is controlling on these facts. I understand the plaintiff's argument for a remand. There's no basis for a remand. This court has unquestioned authority to decide this issue. My colleague agrees that purely legal questions can be decided for the first instance here as long as there's support for it in the record. There is no disputed issues of fact. The issues of law are controlling, and Solomon controls on this issue. I guess it's not about whether it's disputed issues of fact. It's whether there are facts that could be alleged that might distinguish this case from Solomon. So you heard what Mr. Hammack sort of offered as additional facts he'd be adding, and so maybe you could respond to those. Yes, I understood those, well, two points. One, even with respect to the first argument that we made about the failure to allege facts connecting your FID to any specific individual information, Mr. Hughes did not ask for the right to amend or propose any amendments in the district court. So we think it would be. . . Well, I mean, that's before Solomon came down, right? Correct. But that first issue was already raised to him in the district court, and he did not propose any amendments. Secondly, the amendments that were just described here for the first time in this court do not change the relevant facts as compared to Solomon. They don't. What I heard my colleague say is he would allege facts about things about how this particular recipient would know what to do with the information it received. That is the reasonable foreseeability test that this court rejected. This court said the ordinary person test is what matters, and this court said disclosure of a C user field in the middle of computer code does not meet that standard. I can't imagine any facts that would change that reality such that Solomon. . . Well, one of the things Mr. Hammack talked about is the fact that 75% of Americans have Facebook accounts, and that wasn't, I guess, pleaded in Solomon. What's your response to that? I don't understand how that would change the reality that what the court has said is an ordinary person needs to be able to look at the actual disclosures at issue. The crux of this complaint is in that paragraph 42. That is a list of 20 or 25 lines of computer code. That is what they are complaining is the liability-inducing disclosure. It's that C user field. Whether everyone in the country has a Facebook account or no one does, I'm not sure how that impacts the question of whether an ordinary person would understand what that C user field is. You're saying Solomon has committed us to the reasonable person test? That is my reading of the decision, yes. Is that a holding of the case or is it dictum? No, it is a primary holding of the case. The court goes through and analyzes the Third and Ninth Circuit's decisions, which had this ordinary person test. It discusses the First Circuit decision, which has this reasonable foreseeability test. It rejects that and it adopts the ordinary person standard. Do you agree with the point that the privacy agreement doesn't cover this? I do not agree with that. As a separate point, I believe that the record here does show it's relevant in two places. The record here does show that the NFL's privacy policy specifically advised Mr. Hughes that this disclosure would take place. Well, if it does, if you're right about that, can we take judicial notice that he must have signed it in order to become a subscriber? The NFL's position has consistently been that he is bound by the privacy policy that is posted on the website. Oh, that he's bound by it. Well, but I think their point is there's no evidence that he signed it. In the facts that are in the record, there's not a signature involved. That is correct. But can we take judicial notice that he must have signed it to become a subscriber? I believe so, Your Honor. I believe so. So would that end the case right there? I think it ends the case in the NFL's position with respect to his standing to bring this claim. So pivoting to a slightly different issue, unless Your Honors have any more questions about Solomon. So with respect to the standing issue, the NFL has argued and remains true today that Mr. Hughes lacks standing. It is true that this court's decision in Salazar resolves a significant portion of the standing analysis. So here the analysis is driven by a TransUnion Supreme Court decision, which says we have to find a close analog in a traditional tort. The close analog that's been involved here is this harm of this tort of public disclosure of private facts. And while in both Salazar and in our case, the issue of a lack of publicity, a lack of any allegation that the information disclosed would be offensive to a reasonable person, those issues have been disposed of by Salazar and are controlling. The issue Salazar did not address is the fact that Mr. Hughes consented to this disclosure, and consent is an absolute privilege to the tort, making that comparison to the historical tort too wide to allow him. There's just no concrete injury here. There's no money damages. There's no reputational damages. There's certainly no physical injury. So it is this disclosure just purely of, in their view, non-reputationally damaging true facts is the disclosure. And here, where we have the record supporting that there was consent, that that makes that gap too wide, such that Mr. Hughes has not carried his burden to show standing. And I would like to highlight for the court, specifically in the NFL's privacy policy, which I don't think is in dispute, is appropriate for the court to consider here. This is in Joint Appendix 332. Expressly says, social networking services may be able to collect information about you, including your activity, on our website and app. That is the precise disclosure that is at issue here. So we're talking about a Facebook pixel that was present on the user's device because of his participation in a Facebook program. And then that Facebook pixel operates to allow a data transmission between the user's device and Facebook. That's exactly what's described in the NFL's privacy policy. Furthermore, that's described in Facebook's privacy policy, which Mr. Hughes never argues that he didn't consent to. That's not in the briefing anywhere. With respect to the NFL's privacy policy, he just says he didn't consent, but the record actually shows that he did. I do see that I'm out of time, Your Honors. When you say the record shows he did, what are you referring to in the record? The privacy policy itself. But I thought their claim is there's no evidence he signed it. There's no issue of a signature because it's just a digital subscription. I don't think they're taking the position that they didn't consent to the privacy policy. I think they're taking the position that the privacy policy doesn't disclose this particular activity is my understanding of their argument. And you're saying both, that he did sign it and that it covers this? Correct, Your Honor. Thank you, Your Honors. Thank you. We'll hear rebuttal. Thank you, Your Honors. Just a couple of quick points. I want to talk more about what the ordinary person understands regarding computer code and why that remains far afield and what we can allege here. Think about how text messages work. Your device receives a modulated radio wave that represents a string of binary code. But you don't need to understand or interpret the radio wave traveling at the speed of light toward your phone. You don't have to read and understand binary code. On your device, when you receive a text message, it appears in plain English and you just read it. That's the allegation that we would add here. The ordinary person does not need to interact with and does not need to understand computer code operating behind websites. The transmission we're talking about, the disclosure at issue, will be received by the ordinary person as plain text. But it sounds to me like this is really an argument that the ordinary person actually understands more than what the Solomon panel gave them credit for. No, I think it's an argument that the ordinary person receives information in a way different than the way the allegations made it appear in Solomon. Which is to say, Solomon involved an allegation that said, look at this string of computer code that's really garbled. What can we say the ordinary person would understand about that string of garbled computer code? And the answer is, actually, when the ordinary person uses a device like a computer or a phone that automatically translates that garbled code into plain text, he would understand it perfectly. And that wasn't the case in Solomon? There was no allegation to that effect in Solomon, correct, Your Honor. I do want to point out quickly that the- But, I mean, it wouldn't have been hard to do, right? It may not have been hard to do, but it wasn't done. But your view is that this was lost on the panel? Well, my view is that the panel, again, was confined by the allegations before it. And that allegation was not before it. So why don't we go back down to the district court and hash out on different allegations, updated in light of Solomon's holding. Why don't we hash out, find out the scope of that decision and whether on different allegations that account for the way ordinary people actually interact with websites and receive information, what that ordinary person would understand. That question shouldn't be resolved against Mr. Hughes based on Ms. Solomon's allegations. It should be resolved on Mr. Hughes' allegations that he gets to make in light of Solomon, which changed the law for the first time on May 1st, 2025. He had no notice of it before that fact. If I could- But the Solomon panel did deny leave to amend. And it seems to me that the kind of amendments you were contemplating here would have been just as easy to make in Solomon. Well, that may be true. But, again, Solomon and Mr. Hughes, Ms. Solomon, I mean, and Mr. Hughes stand in different shoes on that question. Ms. Solomon had specific notice of these exact arguments at the district court and on appeal. She had an opportunity at the district court to explain how she would amend and an opportunity, I presume, at the Second Circuit to explain how she would amend. And yet she offered no proposed amendments. Mr. Hughes did not have that opportunity. The argument, which I heard my colleague say raised the precise issue that Solomon raised, did not raise that issue at all. They did not raise the argument that the computer code is the thing the ordinary person would not understand. We did not confront that argument. We should be permitted to confront it on updated allegations in light of Solomon on remand. If we take judicial notice that he signed the privacy agreement, does this case, could this case then turn on the scope of the privacy agreement? I suppose it could turn on the scope of the privacy agreement, but only in the exact same way that it could have in Salazar. That privacy policy came up the exact same way in Salazar, and the Salazar court said, this is really fact-bound. The district court didn't resolve the scope of the privacy policy or what exactly he consented to, vacate and remand and send it back down. How is it fact? It's a written agreement, isn't it? Right. Whether he consented— It's fact-bound. Well, because the language of that written agreement matters a great deal, and the scope is— So is that just a matter of interpreting text? It could be a matter of interpreting text, but I think in the consent context, you have to look at what, again, what the ordinary person would have understood those words to mean. And when you have a policy that speaks of third parties being able to collect information or the NFL being able to collect information, that's very different than a policy that discloses specifically— Well, if you're right that that's the question, what do you contemplate would happen when you present facts as to what the ordinary person would—how they would interpret it? Well, the district court would resolve that question in the first instance. Based on what? Based on what its view of the facts that an ordinary person would understand from the disclosures at issue. Would you call in some ordinary people and ask them? I wish I knew how to prove what the ordinary person knew when we're dealing with what this person actually knew. It sounds to me like a normal—just as with a statute, if you construe it, there could be more than one meaning, but you construe it as a matter of law. Well, it is different from a statute, I think, Your Honor. I think it matters in particular what Mr. Hughes actually understood. So, for example, you could vacate and remand— Oh, but would that be individually understood? I think that's a relevant consideration, yes. Yes. For example, if we go back down and take depositions and Mr. Hughes says, I understood this passage to mean X, not Y, I think that's a relevant consideration that the court would have to consider, for example, on a motion for summary judgment. The test of an ordinary person is what the plaintiff understood? Well, no, that's not what I'm saying there, Your Honor. What I'm saying there is the scope of consent— He wanted to take evidence of what he understood. Correct. The scope of the evidence relevant to the question of consent includes what the actual user consented to, what the actual user believed and understood the disclosures to mean. So you're saying that the ordinary person test is actually a subjective test? Sorry, I probably shouldn't have used ordinary person there. I think that's gotten us sideways here. But what I'm saying, what I'm trying to say, is that the scope of his consent, the scope of Mr. Hughes' consent to privacy policies hinges on what he actually understood those policies to mean. Subjectively? Correct. Okay. Any case ever say that? Sorry, say that again? Any case ever say that? I'll look for it and I'll hope to include it in our May 26th briefing. Thank you both. Thank you. And we will take the matter under advisement and we will await the briefing in a couple of weeks. Thank you for submitting it.